UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CLARENCE SHED, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-5523 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| FRATERNAL ENTERPRISES LP d/b/a | ) | |
| BREDEMANN FORD, JOE | ) | |
| BREDEMANN, JOHN SAGAT, JR., and | ) | |
| VICTOR MARTINEZ, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Clarence Shed bought a used car, a 1999 Cadillac Eldorado, from a local car dealership. Buying a car from the last century is a bit of a gamble. And the car didn't come with a bunch of guarantees to put his mind at ease. Quite the opposite – he bought it "as is."

As it turns out, "as is" meant that it came with parts that leaked. A few days after the purchase, Shed discovered that the car was losing fluid. He contacted the dealership, and they agreed to take another look. The dealership later discovered that it needed thousands of dollars in repairs.

The car wasn't running smoothly, and Shed's interactions with the dealership weren't any better. As he tells it, they gave him the run-around. Shed wasn't willing to foot the bill. He believed that the dealership had an obligation to pay for it under state warranty law. After some back-and-forth, the dealership eventually repurchased the car, and Shed signed a release.

Shed then turned around and filed a *pro se* complaint about his experience with the dealership. Shed filed a string of amended complaints, and the Court later appointed counsel.

The current version, the sixth amended complaint, includes two counts: racial discrimination under 42 U.S.C. § 1981, and breach of the implied covenant of good faith and fair dealing.

Defendants filed a motion to dismiss. For the reasons stated below, the motion to dismiss is granted.

## Background

At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

In 2021, Clarence Shed, an African-American, responded to an ad by Bredemann Ford for a 1999 Cadillac Eldorado. *See* Sixth Am. Cplt., at ¶ 12 (Dckt. No. 66). A couple days later, Shed went to the dealership to kick the tires and take a look under the hood. *Id.* at ¶ 14.

The car wasn't exactly what was advertised, at least on the outside. The ad showed a white car, but in person, the car was brown. *Id.*

Even so, Shed remained interested. He inspected the vehicle, and decided to buy it. *Id.* Defendant Victor Martinez, the salesperson, told Shed that the dealership "was going to look the car over and make sure it was in good and proper condition." *Id.*

A few days later, Shed returned to the dealership to pick up his new set of wheels. Martinez gave Shed the keys and told him that the car "was fully checked and running perfectly." *Id.* at ¶ 15.

That day, Shed and Bredemann Ford signed an agreement for the sale of the car "as-is" for $7,450. *Id.* at ¶¶ 15, 25. The purchase order highlighted the lack of warranties: "USED

VEHICLE 'AS IS.' Purchaser will bear the entire expense of repairing or correcting any defects that presently exist or that may at any time hereafter occur in the vehicle. . . . THIS VEHICLE IS SOLD AS IS WITH NO WARRANTY AS TO MECHANICAL CONDITION." *See* Purchase Order (Dckt. No. 66-1, at 3 of 3).[1]

The purchase order was not a bespoke agreement. That is, it was not an original contract tailored to Shed (only). Quite the opposite. Shed and the dealership signed a preprinted form. And then he drove off.

Things went downhill quickly. A few days later, Shed noticed liquid leaking from the car. *See* Sixth Am. Cplt., at ¶ 16 (Dckt. No. 66). An independent dealer inspected the vehicle, and spotted serious oil and coolant leakage. *Id.*

Shed was none too pleased, and he contacted Bredemann Ford about the defect. At the suggestion of Martinez, Shed had the car towed back to the dealership. *Id.* at ¶ 17.

A few days later, Martinez spoke with Shed over the phone, and delivered unhappy news about the state of the car. The Cadillac needed repairs, and it would cost $3,500. *Id.* at ¶ 18. Putting that estimate in perspective, the repair cost was almost half the price tag of the car itself ($7,450). Shed told Martinez that, in his view, an Illinois warranty statute required the dealership to fix the car for free. *Id.*

They spoke again the next day. *Id.* at ¶ 19. Martinez reported that the dealership would not fix the car, and referred Shed to another employee. *Id.*

---

[1] Shed attached the purchase order to the complaint, so the Court can consider it at the motion-to-dismiss stage. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Tobey v. Chibucos*, 890 F.3d 634, 648 (7th Cir. 2018) ("A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice.") (quotation marks omitted). The purchase order also contained an arbitration provision. Shed agreed to "sign an Arbitration Agreement with Dealer." *See* Purchase Order (Dckt. No. 66, at 3 of 3). But Defendants have not invoked arbitration in this lawsuit.

Shed soon spoke with the owner of the dealership, Defendant Joe Bredemann. Shed reiterated his view that the dealership had an obligation under state warranty law to fix the car. *Id.* at ¶ 20. And then things went south.

According to Shed, "Defendant Joe Bredemann immediately reacted in a raised voice, irritated manner, and with language that belittled Plaintiff's intelligence, indicating Plaintiff was ignorant and could not tell him what he is obligated to do." *Id.* "Defendant Joe Bredemann demanded to know where Plaintiff was from, and upon learning Plaintiff is from a certain neighborhood in Chicago, Defendant Joe Bredemann continued to further berate Plaintiff." *Id.*

Shed believed that the conversation revealed a racial animus. "Plaintiff's business and life experience made it apparent to Plaintiff that the intonations and belittling statements of Defendant Joe Bredemann in that conversation were on account of contempt for his race, and likely with a belief that Plaintiff could be pushed around." *Id.*

At the end of the conversation, Bredemann repeated that he was not fixing the "damn car," and he demanded that Shed return the title. *Id.*

On August 20, 2021, Shed returned to the dealership to obtain his personal belongings from the vehicle. *Id.* at ¶ 21. At first, the dealership gave him the run-around, claiming that the car wasn't there. *Id.* When Shed spotted the car in the lot, Defendant Sagat said that the dealership didn't have the keys. *Id.* Later, another employee helped Shed get his belongings, adding that he felt sorry for Shed. *Id.*

Defendant Sagat demanded that Shed return the title to the car. *Id.* at ¶ 22. He used an expletive (although the complaint doesn't reveal what it was). *Id.*

4

As Shed viewed it, the interaction "showed belittlement on account of Plaintiff's race." *Id.* "On information and belief the Defendants do not treat their white customers so dishonestly, disrespectfully or otherwise with discrimination on account of race." *Id.* at ¶ 23.

A month later, Shed returned the car title to the dealership, and in exchange, the dealership gave him a check for $7,450. *Id.* at ¶ 25. So Shed received his money back.

Defendant Sagat told Shed that if he wanted his money back, then he had to sign a settlement agreement with a release. *Id.* Shed, "under inordinate pressure," reluctantly executed the settlement agreement, returned title, and accepted the check. *Id.*

Shed alleges that he suffered a loss, even though the dealership returned his money. Shed incurred the cost of towing the car back to the dealership. *Id.* at ¶ 40. And he endured the hassle of returning a defective car. *Id.* at ¶ 35.

Unhappy with his car-buying experience, Shed filed a *pro se* complaint against Joe Bredemann, John Sagat, Jr., Victor Martinez, and (later) the dealership itself.[2] *See* Cplt. (Dckt. No. 1). He filed an application to proceed *in forma pauperis*, too, which led this Court to prescreen the complaint.

The complaint was only three pages long, and it was entirely conclusory. So this Court dismissed it, but gave Shed leave to amend. *See* 10/28/21 Order (Dckt. No. 8).

---

[2] Over time, the named Defendants have changed. Shed's initial complaint was against Joe Bredemann, John Sagat, Jr., and Victor Martinez. *See* Cplt., at 1 (Dckt. No. 1). But by the time he filed the fifth amended complaint, First Family Inc. d/b/a Bredemann Motors was added as a defendant. *See* Fifth Am. Cplt., at 1 (Dckt. No. 46). Then, in April 2023, this Court granted Shed's agreed motion to file a sixth amended complaint, so that he could substitute Fraternal Enterprises LP for Defendant First Family Inc. as a defendant. *See* 4/13/23 Order (Dckt. No. 64). In granting that motion, the Court determined that "since not much is changing" in the sixth amended complaint, the Court would rule on Defendants' pending motion to dismiss the fifth amended complaint "as if it was directed at the soon-to-be-filed sixth amended complaint." *Id.*

5

The amended complaint included a claim under section 1983. But the Court dismissed the complaint because Defendants are not state actors. *See* 12/3/21 Order (Dckt. No. 10). The amended complaint included a state law claim about warranties, too, but there was no complete diversity and thus no diversity jurisdiction. Once again, the Court gave Shed another try.

Shed then filed a second amended complaint, which purported to include a *Bivens* claim, among others. This Court dismissed that complaint, too. *See* 12/20/21 Order (Dckt. No. 13). Among other things, the Court concluded that the complaint was too conclusory. *Id.* And *Bivens* (such as it is) doesn't apply without federal actors.

Shed then filed a third amended complaint. Once again, the Court concluded that the allegation of racial discrimination was too conclusory to give rise to a plausible claim. "Alleging a conclusion is not enough. Here, the complaint does not include any facts that could give rise to a plausible inference that Defendants discriminated against him on the basis of his race." *See* 1/24/22 Order (Dckt. No. 15).

Shed then paid the filing fee, and filed a fourth amended complaint. He filed a motion for the appointment of counsel, too. This Court granted that request.[3] Shed is a senior citizen, and he lives out of state. He is a veteran of the U.S. Army.[4]

Counsel later filed a fifth amended complaint, and then a sixth amended complaint (to correct a name). The motion to dismiss the sixth amended complaint is now before the Court.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.

---

[3] The Court thanks Harvey Sheldon of Hinshaw & Culbertson for his *pro bono* representation.
[4] In addition to the *Pruitt* factors for the appointment of counsel, the Court granted the motion partly in recognition of Shed's service to his country.

1990).  In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor.  *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**Analysis**

**I.      Section 1981 (Count I)**

Shed's first claim is that Defendants discriminated against him based on his race in violation of 42 U.S.C. § 1981.

Section 1981 "protects the right of all persons to make and enforce contracts regardless of race."  *Carter v. Chicago State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015).  The statute provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."  *See* 42 U.S.C. § 1981(a).  The phrase "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *See* 42 U.S.C. § 1981(b).

To state a claim under section 1981, a plaintiff must allege that "(1) he is a member of a racial minority; (2) the defendants had the intent to discriminate on the basis of race; and (3) the discrimination concerned the making or enforcing of a contract." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006).

Section 1981 "can be violated only by purposeful discrimination." *See General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982); *see also McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885–86 (7th Cir. 2012) ("Title VII and § 1981 claims require a showing of intentional discrimination."). The statute requires a showing of causation, too. A plaintiff must allege that "but for race, [he] would not have suffered the loss of a legally protected right." *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

Even when read in Plaintiff's favor, the complaint fails to state a claim of racial discrimination when it comes to contracts. For starters, the case does not involve an allegation that the dealership refused to deal with Shed on account of his race. Shed wanted to buy a car, and the dealership sold him a car. Then, Shed wanted to return the car, and the dealership allowed him to return the car. *See Morris v. Office Max, Inc.*, 89 F.3d 411, 414 (7th Cir. 1996) ("They cannot point to specific facts showing that Office Max deprived them of any of the enumerated rights in § 1981 and, specifically, the right to make and enforce a contract. They were denied neither admittance nor service, nor were they asked to leave the store.").

Instead, the complaint alleges that Shed and the dealership entered into two agreements: a contract to buy the vehicle, and a contract to return the vehicle.

The complaint does not allege that Defendants discriminated against Shed when they sold him the vehicle. Shed alleges that the dealership sold him an old Cadillac on an "as-is" basis,

8

and that the vehicle turned out to be a lemon. There is no allegation that the dealership intentionally sold Shed a lemon because of his race.

And there is no allegation that selling a car on an "as-is" basis had anything to do with race, either. Shed does not allege, for example, that the dealership sold used cars to white customers *with* warranties, but sold black customers cars *without* warranties. In fact, the purchase order shows that the dealership used a preprinted form.

The other contract involved the eventual return of the vehicle. And once again, the complaint does not allege racial discrimination. For starters, the complaint does not allege that Shed was unable to return his car because of his race. In fact, the complaint alleges that the dealership repurchased the car and returned all of his money. *Id.* at ¶ 25.

The complaint does not allege that the dealership entered into better contracts with white customers than with black customers. If anything, it is hard to see how Shed could allege any such thing, given that he received all of his money back. He got 100 cents on the dollar.[5]

The complaint does allege that the dealership required Shed to enter into a release when it repurchased the car. *Id.* at ¶ 25. But once again, there is no allegation that the dealership required black customers to release claims, but preserved the right of white customers to sue the dealership. It is not as if white customers got their money back *and* kept the right to sue.

The complaint does include a few allegations about the tone from the dealership. Shed believed that the dealership showed him disrespect, and gave him the run-around. Shed believes that the dealership gave him a hard time and belittled him because of his race.

---

[5] True, Shed had to pay to tow the car back to the dealership. But the towing took place before the alleged discriminatory treatment when Shed tried to return the car. The alleged discriminatory treatment did not cause Shed to pay towing costs, because the towing came before the alleged discrimination.

9

Even so, the complaint includes no facts that could support a plausible inference of racial discrimination. The complaint alleges that certain Defendants used expletives, but there is no allegation of a *racial* expletive. *Id.* at ¶ 22. A question about where Shed was from is not enough to support a plausible inference of racial animus, either. *Id.* at ¶ 20.

At best, the complaint includes conclusory allegations that Defendants gave Shed a hard time because of his race. Conclusory allegations don't cut it. *See, e.g., Mir v. State Farm Mut. Auto. Ins. Co.*, 847 F. App'x 347, 350 (7th Cir. 2021) (affirming the dismissal of a conclusory allegation of discrimination under section 1981); *Walton v. First Merchants Bank*, 772 F. App'x 349, 350–51 (7th Cir. 2019); *see also Williams v. State Farm Mut. Auto. Ins. Co.*, 2022 WL 2390828, at *14 (N.D. Ill. 2022) (holding that claims do not become plausible by "merely tack[ing] 'because of race'" onto the allegations); *Onyango v. Nick & Howard, LLC*, 607 F. App'x 552, 555 (7th Cir. 2015) (holding that a conclusion of racial discrimination "based on facts that are merely consistent with a defendant's liability is legally insufficient") (quotation marks omitted); *Thurmon v. Mount Carmel High School*, 191 F. Supp. 3d 894, 897 (N.D. Ill. 2016) (dismissing a section 1981 claim because "to the extent that Plaintiff does allege a nexus between racial discrimination and [his] specific treatment, it is a conclusory and unsupported allegation").

At the end of the day, when it comes to allegations of intent, the complaint does not include enough facts to "nudge[] [his] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint does not "contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

Instead, Shed merely alleges that Defendants treated him poorly, and did so with the intent to discriminate based on race. "These allegations of intent are the sort of conclusory allegations that are insufficient under *Iqbal*." *McReynolds*, 694 F.3d at 886; *see also Swanson v. PNC Bank, N.A.*, 2022 WL 989361, at *2 (7th Cir. 2022) (affirming dismissal of a plaintiff's section 1981 claim where her "allegation of discriminatory motive rest[ed] on a chain of speculation"). The allegations of intent are too conclusory to support a claim.

The complaint also does not allege discriminatory treatment that is actionable under section 1981. For purposes of this motion, the Court assumes that the dealership gave Shed a hard time and showed disrespect when he tried to return the car. *See* Sixth Am. Cplt., at ¶¶ 20, 23 (Dckt. No. 66). Needless to say, everyone deserves respect, and no one should get treated rudely on account of their race.

But rude treatment, standing alone, is not actionable. The statute does not prohibit rude or unprofessional conduct writ large, even if it is motivated by racial animus. *See Morris*, 89 F.3d at 415 ("While the incident that Morris and Nailor experienced was unfortunate and undoubtedly disconcerting and humiliating, it does not constitute a violation of the statutes."). Instead, a plaintiff must allege that the defendant "deprived them of any of the enumerated rights in § 1981," that is, "the right to make and enforce a contract." *Morris*, 89 F.3d at 414.

In the employment context, federal law "does not protect against petty slights, minor annoyances, and bad manners." *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."); *Cain v. Locke*, 483 F. App'x 276, 281 (7th Cir. 2012) ("[T]he fact that her supervisors may have been rude or

11

intimidating does not elevate these incidents to the level of materially adverse actions.") (addressing a hostile work environment claim); *Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012) ("Title VII protects against discrimination, not personal animosity or juvenile behavior.") (quotation marks omitted); *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 982 (7th Cir. 2008) (holding that a "petty slight" is not actionable employment discrimination); *Bell v. E.P.A.*, 232 F.3d 546, 554–55 (7th Cir. 2000) (holding that "demeaning assignments" and "verbal abuse" do not constitute actionable retaliation). It is hard to see why section 1981 would be any different when the claim involves contracts outside the employment context.

Title VII is not a "general civility code for the American workplace." *See Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006). The same can be said about section 1981 when it comes to contracts. The statute prohibits discrimination when parties "make and enforce contracts." *See* 42 U.S.C. § 1981(a). And here, the complaint includes no facts about discrimination when buying or returning the vehicle.

Shed has not alleged that he was treated differently when it came to contracts on account of his race. The complaint does not allege a refusal to deal by the dealership. And the complaint does not allege that the dealership offered Shed less favorable terms because of his race.

Shed wanted to buy the Cadillac, and the dealership sold him the Cadillac. Shed wanted to return the Cadillac, and the dealership repurchased the Cadillac. Each time, Shed got what he wanted. He swapped his money for the car, and then the car for his money. There is no allegation in the complaint that white customers received a better contract when they bought or returned vehicles.

At the end of the day, Shed bought the car, then returned it and received all of his money back. Whatever happened in the negotiations, the reality is that the dealership sold him the car,

and then returned his money, so there is no allegation of a deprivation of his rights under section 1981. *See Morris*, 89 F.3d at 414.

The sixth amended complaint fails to allege that Defendants discriminated against Shed on account of his race when making contracts about the Cadillac. Count I is dismissed.

## II.     Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II)

Shed's second claim is for breach of the implied covenant of good faith and fair dealing. Specifically, he alleges that Bredemann Ford "committed numerous wrongful acts and misrepresentations that amounted to a violation of the covenant of good faith and fair dealing." *See* Sixth Am. Cplt., at ¶ 38 (Dckt. No. 66).

The implied covenant of good faith and fair dealing applies when a party exercises discretion under a contract in a manner that was unexpected. *See RBS Citizens, N.A. v. Sanyou Imp., Inc.*, 525 F. App'x 495, 499 (7th Cir. 2013) ("Illinois courts use the rule to prevent one party from depriving another of the right to receive the benefit of the contract in a way the parties could not have contemplated at the time of drafting."); *In re Kmart Corp.*, 434 F.3d 536, 542 (7th Cir. 2006) (noting that the doctrine prevents "opportunistic behavior" and "self-serving cleverness").

The implied covenant of good faith and fair dealing is not a free-wheeling obligation to treat people well, or deal with people fairly. It is a rule of construction when interpreting a discretionary term in a contract. *See Barwin v. Village of Oak Park*, 54 F.4th 443, 454 (7th Cir. 2022) ("[T]he obligation is not a source of rights independent of the parties' contract, nor does the duty supply a [plaintiff] with a separate cause of action."); *In re Kmart Corp.*, 434 F.3d at 542 ("This doctrine is a rule of construction, not a stand-alone obligation."); *PNC Bank, N.A. v. Five-Star Audiovisual, Inc.*, 2022 WL 4534616, at *2 (N.D. Ill. 2022) ("Illinois law does not

13

recognize an independent cause of action based on the duty of good faith – untied from a claim for breach of contract . . . ."); *Brinley Holdings Inc. v. RSH Aviation, Inc.*, 580 F. Supp. 3d 520, 554 (N.D. Ill. 2022) ("The implied covenant of good faith is a rule of construction, and is not a vehicle to erase express contractual rights."); *Chrysler Credit Corp. v. Marino*, 63 F.3d 574, 579 (7th Cir. 1995) ("The contractual duty of good faith only applies as a method by which gaps in the contract are filled.").

The complaint fails to allege a breach of the implied covenant of good faith and fair dealing. Shed points to no language in the contract that the dealership exploited in a way that the parties would not have expected. Indeed, he concedes that "the contract on its face is not the source of unfair dealing but rather the Defendants' behavior and racially motived abusive tactics in connection with Plaintiff's purchase and eventual return of the car." *See* Pl.'s Resp. to Mtn. to Dismiss, at 7 (Dckt. No. 55).

That's not a claim. The implied covenant of good faith "does not create 'an enforceable legal duty to be nice or to behave decently in a general way.'" *See Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1445 (7th Cir. 1992) (quoting *Zick v. Verson Allsteel Press Co.*, 623 F. Supp. 927, 929 (N.D. Ill. 1985)); *see also Market St. Assoc. Ltd. P'ship v. Frey*, 941 F.2d 588, 594 (7th Cir. 1991) ("[E]ven after you have signed a contract, you are not obligated to become an altruist toward the other party and relax the terms if he gets into trouble in performing his side of the bargain."); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990) ("Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.'"); *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir. 1987) ("It is not a version of the Golden Rule, to regard the interests of one's contracting partner the same way you

regard your own."). "Contract law does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brother's keeper." *Original Great Am. Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992).

Shed has not plausibly alleged a claim for breach of the implied covenant of good faith and fair dealing. Accordingly, the Court dismisses Count II.

## Conclusion

For the foregoing reasons, the Court dismisses with prejudice the sixth amended complaint in its entirety.

Federal Rule of Civil Procedure 15(a)(2) directs a district court to grant leave to amend a complaint "when justice so requires." But where, like here, a court has offered the plaintiff multiple chances to amend the complaint to fix deficiencies, the court may deny further opportunity to amend based on futility. *See, e.g.*, *United States ex rel. Gutman v. Chicago Vein Inst.*, 2021 WL 170674, at *7 (N.D. Ill. 2021); *Hughes v. Sw Airlines Co.*, 409 F. Supp. 3d 653, 659 (N.D. Ill. 2019); *Jain v. Butler Sch. Dist. 53*, 303 F. Supp. 3d 672, 683 (N.D. Ill. 2018); *Annan v. Zaborowski*, 2013 WL 3771248, at *3 (N.D. Ill. 2013); *Butler v. E. Lake Mgmt. Group*, 2013 WL 2112032, at *4 (N.D. Ill. 2013); *Shailja Gandhi Revocable Tr. (Nov. 6, 2002) v. Sitara Cap. Mgmt., LLC*, 2012 WL 3580680, at *10–11 (N.D. Ill. 2012). Here, Shed has had seven bites at the apple, and another bite would be futile.

Date: April 25, 2023

                                                    Steven C. Seeger
                                                    United States District Judge